**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 11-3837

INTERSTATE OUTDOOR ADVERTISING, L.P.,
Appellant

v.

ZONING BOARD OF THE TOWNSHIP OF MOUNT
LAUREL and
THE TOWNSHIP OF MOUNT LAUREL


On Appeal from the United States District Court
for the District of New Jersey
(Civ. No. 09-1376)
District Judge: Hon. Robert B. Kugler

Argued: October 5, 2012

Before: McKEE, *Chief Judge*, JORDAN, and VANASKIE,
*Circuit Judges*

(Opinion filed:  February 11, 2013)

LOUIS L. D'ARMINIO, ESQ.  (Argued)
REGINALD JENKINS, ESQ.
Price, Meese, Shulman & D'Arminio, P.C.
Mack-Cali Corporate Center
50 Tice Boulevard
Woodcliff Lake, New Jersey  07006
*Attorneys for Appellant*

CHRISTOPHER J. NORMAN, ESQ. (Argued)
Raymond, Coleman, Heinold & Norman, LP
325 New Albany Road
Moorestown, New Jersey 08057

GEORGE J. BOTCHEOS, ESQ.
436 Commerce Lane, Suite A
West Berlin, New Jersey 08091
*Attorneys for Appellee Township of Mount Laurel*

ANTHONY P. COSTA, ESQ.
63 Warwick Road
Stratford, New Jersey 08084
*Attorney for Appellee Zoning Board of the Township of Mount Laurel*

OPINION

McKEE, *Chief Judge*.

Interstate Outdoor Advertising, L.P. ("Interstate") appeals the District Court's grant of summary judgment dismissing Interstate's claim that the Township of Mount Laurel's zoning ordinance prohibiting the erection of outdoor advertising displays is unconstitutional. For the reasons that follow, we will affirm the District Court's dismissal.

## I. FACTS AND PROCEDURAL HISTORY

Interstate filed development applications with the Mount Laurel Township Zoning Board of Adjustment ("Zoning Board") in which Interstate requested approval for nine outdoor advertising signs that Interstate wanted to erect in the township along U.S. Interstate-295. I-295 is a major transportation corridor with three lanes of traffic running through the township in each direction. Thereafter, the Mount Laurel Township Council adopted Ordinance 2008-12,[1] the constitutionality of which is challenged in this case.

---

[1] Ordinance 2008-12, titled "Prohibited signs," states, in relevant part:

> The following signs and sign-types are prohibited within the Township and shall not be erected. . . .
> (a) Billboards.

MOUNT LAUREL, N.J., TOWNSHIP CODE § 154-84 (2008).

2

Ordinance 2008-12 sets out a list of goals and purposes, each of which relates either to aesthetics or traffic safety. Although Mount Laurel has regulated the use of signs since 1988,[2] the 2008 ordinance incorporated two new provisions: Section 154-89,[3] which allows all privately-owned signs to display a commercial or non-commercial message,

---

[2] In 1988, Mount Laurel adopted Ordinance 1988-7, which created a zoning system used to control signage. This ordinance included a specific ban on billboards in Section 154-85, which states, in relevant part:

> The following signs are prohibited in all zoning districts:
> . . . O. Outdoor advertising signs (i.e., billboards).
> . . . S. Signs immediately adjacent to interstate 295 and the New Jersey Turnpike.

MOUNT LAUREL, N.J., TOWNSHIP CODE § 154-85 (1998).

[3] Section 154-89, titled "Substitution of noncommercial speech for commercial speech" states:

> Notwithstanding anything contained in this Section or the Code to the contrary, any sign erected pursuant to the provision of this Section or the Code with a commercial message may, at the option of the owner, contain a noncommercial message unrelated to the business located on the premises where the sign is erected. The noncommercial message may occupy the entire sign face or any portion thereof. The sign face may be changed from commercial to noncommercial messages or from one noncommercial message to another as frequently as desired by the owner of the sign, provided that the sign is not a prohibited sign or sign-type and provided that the size, height, setback and other dimensional criteria contained in this Section and Code have been satisfied.

MOUNT LAUREL, N.J., TOWNSHIP CODE § 154-89 (2008).

3

and Section 154-90,[4] which provides that Ordinance 2008-12 shall be enforced in a content-neutral fashion.

When Ordinance 2008-12 was adopted, Interstate had four billboard applications pending before the Zoning Board. In September 2008, the Zoning Board began holding public hearings on Interstate's four applications. Interstate presented expert testimony on both the aesthetic suitability of the proposed billboards and their negligible impact on traffic safety. Despite that testimony, the Zoning Board denied each of Interstate's applications.

Thereafter, Interstate filed this lawsuit alleging that Ordinance 2008-12 violated the First Amendment guarantee of free speech.[5] After analyzing the constitutionality of Ordinance 2008-12 under the four-part test for commercial speech set out in *Central Hudson Gas & Electric Corp. v. Public Service Commission of N.Y.*, 447 U.S. 557, 566 (1980), the District Court granted Mount Laurel's motion for summary judgment. The Court held that the ordinance was a reasonable means of achieving the Township's substantial interests of traffic safety and maintaining the natural beauty of the Township, that the Township enacted Ordinance 2008-12 based upon evidence that it would advance those twin goals, and that the ordinance was reasonably related to achieving traffic safety and preserving aesthetics.

---

[4] Section 154-90, titled "Content neutrality as to sign message (viewpoint)," states:

> Notwithstanding anything contained in this Section or the Code to the contrary, no sign or sign structure shall be subject to any limitation based upon the content (viewpoint) of the message contained on such sign or displayed on such sign structure.

MOUNT LAUREL, N.J., TOWNSHIP CODE § 154-90 (2008).

[5] Interstate also challenged the constitutionality of the ordinance under the New Jersey State Constitution, and the Township Zoning Ordinance and the Municipal Land Use Law, N.J.S.A. 40:55D-1 *et seq.* Those challenges, however, are not at issue in this appeal.

4

This appeal followed.

## II. DISCUSSION

## A.  JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction to review a final decision of a district court pursuant to 28 U.S.C. § 1291.  The District Court had federal question jurisdiction pursuant to 28 U.S.C. § 1331.

We exercise plenary review over a grant of summary judgment.  *Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.,* 316 F.3d 431, 443 (3d Cir. 2003).  In reviewing the decision of the district court, we assess the record using the same summary judgment standard used by district courts. *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000).  To prevail on a motion for summary judgment, the moving party must demonstrate "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In making this determination, [we] must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor."  *Farrell,* 206 F.3d at 278 (internal quotations omitted).

Because Ordinance 2008-12 concerns both commercial and noncommercial speech, we must conduct two distinct but related inquiries.

## B.  THE IMPACT ON COMMERCIAL SPEECH

Ordinance 2008-12 clearly limits Interstate's commercial speech.  Since there is no allegation that Interstate's billboards are misleading or advance illegal activity, the billboards are entitled to the protection of the First Amendment.  Accordingly, the ordinance can only withstand Interstate's challenge if it serves a substantial governmental interest and is no more extensive than necessary to advance that interest. *Central Hudson*, 477 U.S. at 566.

Mount Laurel bears the burden of establishing the

constitutionality of Ordinance 2008-12. *Bd. of Trs. of the State Univ. of N.Y. v. Fox,* 492 U.S. 469, 480 (1989). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield v. Fane*, 507 U.S. 761, 770–71 (1993) (citations omitted).

The parties agree that Mt. Laurel has a substantial interest in both the aesthetics and safety of its highways. However, we must also consider the "fit" between the legislative ends and the means chosen to accomplish them. *See Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995).

Mount Laurel presented extensive evidence before the District Court to support its contention that Ordinance 2008-12 directly advances the Township's goals of traffic safety and aesthetics. The evidence included a December 8, 2010 report from the Mount Laurel Township Traffic Engineer that reviewed 37 articles pertaining to billboards and traffic safety, and concluded that limiting the number of driver distractions would advance the goal of traffic safety.[6] The evidence also

---

[6] These studies included: (1) the 2006 National Highway Traffic Safety Administration Report, "The Impact of Driver Inattention on Near-Crash/Crash Risk: An Analysis Using the 100 Car Naturalistic Driving Study Data," which found that 23% of accidents that occur in metropolitan areas were the result of drivers taking their eyes off the road for two seconds or more; (2) "Forensic Aspects of Vision and Highway Safety," a 2001 study concluding that driving distractions that cause drivers to take their eyes off the road are likely to result in poor vision of the road; (3) the Madigan-Hyland Study, which showed that 32% of accidents on the NY State Thruway occurred on the 13% of the highway with outdoor advertising; and (4) the Milwaukee County Stadium Variable Message Sign Study, which showed that vehicular accidents increased by 8% to 35% (depending on the type of crash) immediately after a billboard was installed adjacent to Milwaukee County Stadium on I-94. The District Court excluded one study cited by Mount Laurel for irrelevance, "Standards for On-Premise Signs," by the United States Sign

included expert reports and deposition testimony of the Township's planner. The planner testified that Mount Laurel's sign control ordinances had effectively preserved the "billboard free aesthetic charm and character" of the Township for 23 years.

Interstate offered its own expert testimony to rebut the Township's evidence. Interstate provided testimony from a traffic expert who explained that, according to an accident analysis of the I-295 corridor using the New Jersey Department of Transportation's crash records database, the accident rate in the area of Interstate's proposed billboards was well below that which would indicate a hazardous location.[7] Interstate's traffic expert also testified that several studies indicate that there is no causal relationship between the presence of billboards and accidents.[8]

On appeal, Interstate questions the reliability of Mount Laurel's studies. Interstate claims, inter alia, that those studies merely establish a correlation rather than causation between billboards and traffic accidents and that the reports rely on faulty data.[9] Lastly, Interstate argues that the

Council, as it was designed to study only on-premise signs rather than off-premise billboards.

[7] Neither Interstate nor its expert appear to have considered the proposition that the precise reason the accident rate is so low in these proposed locations is *because* there are no billboards on those portions of the roadway.

[8] The District Court noted that one of these studies, the Virginia Tech Study, which concluded that there was no statistical correlation between billboards and traffic accidents, was funded by the Outdoor Advertising Research and Education Foundation, an industry-sponsored organization. The Court also noted that the study had numerous methodological flaws, which was the reason another district court deciding a similar issue of billboard safety in 2005 excluded testimony from the study's principal investigator, Dr. Lee.

[9] Interstate maintains that the correlation is not indicative of a safety concern because billboards are placed on highways that have the most traffic. Thus, argues Interstate, those highways are more prone to accidents because more vehicles use them,

locations where it seeks to post billboards are along the multi-lane, heavily trafficked, Route I-295 corridor in "heavy industrial zones" outside of any residential or scenic views, and that Mount Laurel's concern about preserving aesthetics is therefore overblown.

According to Interstate, the testimony it offered created a genuine issue of material fact that had to be resolved by a fact-finder, rather than at the summary judgment stage. Interstate relies on *Viking Yacht Co. v. Composites One LLC*, 622 F. Supp. 2d 198 (D.N.J. 2009), in stating that "[h]aving competing admissible expert testimony on a particular issue is the epitome of a disputed issue of fact." *Id.* at 203. Moreover, Interstate points out that Mount Laurel never challenged the admissibility of Interstate's expert testimony. Interstate therefore argues that the Court should have permitted a fact-finder to weigh each side's expert's offerings at trial rather than concluding that Mount Laurel was entitled to judgment as a matter of law.

Interstate's position ignores the context in which this issue is presented. As the Supreme Court explained in *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981), each method of communication has its own set of laws, and "[w]e deal here with the law of billboards." *Id.* At 501. In *Metromedia*, the Court noted that it "has often faced the problem of applying broad principles of the First Amendment to unique forums of expression." *Id*. at 500. The result is that "[e]ach method of communicating ideas is a law unto itself and that law must reflect the differing nature, values, abuses and dangers of each method." *Id*. at 501 (internal quotations omitted). Billboards, by their very nature, are capable of communicating a vast array of messages to a very large segment of the public. "But whatever its communicative function, the billboard remains a large, immobile, and permanent structure which like other structures is subject to . . . regulation." *Id.* at 502 (internal quotation marks omitted) (ellipsis in original).

In *Metromedia*, the plaintiffs argued that the city's ordinance would eliminate outdoor advertising in the City of

not because of the presence of billboards.

8

San Diego and "the First and Fourteenth Amendments prohibit the elimination of this medium of communication." *Id*. at 503–4.

In the context of billboards, the Supreme Court has deferred to the collective judgment of both legislatures and lower courts, and highlighted the importance of considering the plainly unattractive nature of billboards when evaluating whether a billboard ban directly advances a local government's interests in traffic safety and aesthetics. In rejecting the plaintiffs' challenge to San Diego's ordinance, the Court explained: "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Id*. at 508.

In *Metromedia*, the City of San Diego presented no evidence that its ban on off-site commercial advertising directly advanced the city's stated goals of traffic safety and aesthetics. *Id*. at 528 (Brennan, J., concurring). Nonetheless, the Supreme Court concluded that the ban on billboards was justified by concerns of aesthetics and traffic safety. *Id*. at 508–10. The Court's conclusion rested on "the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Id*. at 509. The Court also recognized that "billboards by their very nature, wherever located and however constructed, can be perceived as an esthetic harm." *Id*. at 10 (internal quotations omitted). Moreover, there was "nothing . . . to suggest" that the legislature's judgments regarding traffic safety were unreasonable. *Id*. at 509. The force of the deference the Court afforded San Diego's judgments regarding aesthetics and safety is controlling here.

Nor are we persuaded to the contrary by Interstate's reliance on the industrial nature of the disputed stretch of I-295 where Interstate wants to place its billboards. As noted above, Interstate relies in part on the fact that the area is already industrialized and unsightly. According to Interstate, the Township's interest in preserving the appearance and preventing the aesthetic deterioration of the highway should

9

weigh less heavily on the constitutional balance. We disagree. The industrial nature of the highway does not mitigate Mount Laurel's concerns about the aesthetics of the highway. In fact, it may well suggest an even greater need to guard against the deterioration of the Township's character and evoke a greater concern for safety.

Interstate attempts to distinguish the situation here from the facts in *Metromedia* by relying on the substantial evidence it presented to disprove the basis upon which the Township enacted Ordinance 2008-12. According to Interstate, here, unlike in *Metromedia*, there *is* something "to suggest that these judgments are unreasonable." *Metromedia*, 453 U.S. at 509. Interstate thus claims that the blind deference to legislative judgment that Mount Laurel advocates pursuant to the analysis in *Metromedia* is inappropriate here. The argument does have superficial appeal.

However, we do not accept that the mere presentation of contradictory expert testimony so undermines the legislative fit between a law's intended ends and its practical means that it necessarily precludes summary judgment in favor of the township, absent a showing of bad faith. The fact that some of the township's studies can be challenged academically in no way undermines the Supreme Court's deference to local governmental and regulatory judgments about aesthetics and safety insofar as the placement of billboards is concerned.

Moreover, even if we assume *arguendo* that Interstate has raised a genuine issue of material fact as to whether Mount Laurel's traffic studies establish mere correlation of billboard placement and accidents or the requisite causal relationship that Mount Laurel claims, we would still conclude that the ordinance would survive the challenge because it advances the township's substantial interest in the aesthetics of the community. As the Court explained in *Metromedia*:

> It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an

10

'esthetic harm.' . . . . Such esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose.

*Id*. at 510. But here, as in *Metromedia*, "there is no claim . . . that [the Township] has as an ulterior motive the suppression of speech, and the judgment involved here is not so unusual as to raise suspicions in itself." *Id*. Accordingly, there is no issue of fact as to whether the prohibition of billboards "is directly related to the stated objective[] of . . . esthetics." *Id.* at 511. The fact that the ordinance advances that substantial interest in a manner that, although all inclusive, is nevertheless not overly inclusive given the impact of billboards on a community, is sufficient to allow Ordinance 2008-12 to survive Interstate's challenge even though it has a very real impact on Interstate's commercial speech.

In its reply brief, Interstate relies on both *Edenfield* and *Pagan v. Fruchey* in arguing that the Township is required to demonstrate specific proof that it satisfied the *Central Hudson* inquiry. *Edenfield*, 507 U.S. at 770–71; *Pagan v. Fruchey*, 492 F.3d 766, 776 n.8 (6th Cir. 2007). According to Interstate, *Metromedia* does not compel summary judgment on either the issue of traffic safety or of aesthetics, because Mount Laurel failed to prove that billboards are *per se* hazardous, or that billboards are incompatible with the Township's stated goals regarding aesthetics.

However, as Chief Justice Rehnquist explained in *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986), local governments need not generate their own site-specific studies before enacting an ordinance:

The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other studies, *so long as whatever evidence the city relies upon is*

11

> *reasonably believed to be relevant to the to the*
> *problem that the city addresses.*

*Id.* at 51–52 (emphasis added). The fact that Mt. Laurel's studies are subject to academic challenge does not negate the fact that there is nothing on this record to suggest that the Township did not reasonably believe those studies to be relevant to the problems it was trying to address. Rather, the record here supports but one conclusion: Mount Laurel relied upon evidence that directly pertained to the problems the Township was addressing by enacting the challenged ordinance.

Against this background, we have no trouble concluding that Interstate's challenge to the validity of Mount Laurel's studies falls short of creating a genuine issue of material fact as to whether Mount Laurel's legislative judgments were "facially unreasonable" or "palpably false." *Metromedia*, 453 U.S. at 509. Even when viewed in the light most favorable to Interstate, we readily conclude that neither the attack upon Mount Laurel's studies nor Interstate's own contrary evidence would allow a reasonable fact-finder to conclude that there was an insufficient basis for Mount Laurel's conclusion that its billboard ban would directly advance its stated goal of improving the aesthetics of the community.

Moreover, given the language of *Metromedia*, we are not willing to conclude that there is a genuine issue of material fact as to whether the ordinance sufficiently advances the substantial interest of traffic safety. Although Mount Laurel did not undertake any site-specific studies before enacting Ordinance 2008-12, the 37 studies that Mount Laurel relied upon when enacting its billboard ban cannot be said to be insufficient, even when viewed in conjunction with Interstate's expert testimony and studies. Mount Laurel's conclusion that billboards affect traffic safety and aesthetics is neither "facially unreasonable" nor "palpably false."

Interstate also argues that Ordinance 2008-12 is excessive because it goes too far and institutes a total prohibition of billboards. According to Interstate, Mount Laurel's goals of traffic safety and aesthetics could be achieved with a less restrictive ordinance that allows

billboards in certain areas and under particular conditions. However, as we have already explained, in *Metromedia*, the Court reasoned: "[i]f the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them." *Metromedia*, 453 U.S. at 508. Thus, the Township took what was "perhaps the only effective approach" to addressing its concerns for the aesthetics and safety of its highways—a Township-wide ban on billboards.

We therefore conclude that Mt. Laurel has satisfied its burden of establishing that Ordinance 2008-12 is not overly extensive and that it advances substantial interests of the township.

## D. THE IMPACT ON NON-COMMMERCIAL SPEECH

As we noted earlier, the Ordinance also limits noncommercial speech. Such regulations are constitutional "provided that they are justified without reference to the content of the regulated speech, that they serve a significant governmental interest, and that in so doing they leave open ample alternative channels for communication of the information." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976); *Frumer v. Cheltenham Twp.*, 709 F.2d at 874, 876 (3d Cir. 1983).

This aspect of our inquiry does not require much discussion. The text of the ordinance specifically states that it will be applied in a content-neutral fashion, and we have just explained that it directly advances substantial governmental interests. Interstate alleges that the complete ban on billboard messages does not allow for alternative channels for communication. Specifically, Interstate argues that, although various alternative means of communication may be available, those means are not available to the specific target audience of the drivers traveling on I-295 that would be reached by the proposed billboards. Potential alternative channels of communication include on-premise signs, internet advertising, direct mail, radio, newspapers, television, advertising circulars, advertising flyers, commercial vehicle

sign advertising, and public transportation advertising. Interstate claims that these alternatives are inadequate because they are limited to area residents and miss the large numbers of people who drive through the area on the interstate.

However, "maximizing . . . profit is not the animating concern of the First Amendment. The fact that restrictions prohibit a form of speech attractive to plaintiff does not mean that no reasonable alternative channels of communication are available." *Naser Jewelers, Inc. v. City of Concord, N.H.*, 513 F.3d 27, 37 (1st Cir. 2008). Therefore, the mere fact that Interstate will not be able to reach the distinct audience of travelers on the particular section of I-295 that it desires to target does not mean that adequate alternative means of communication do not exist. That fact is underscored by the Supreme Court's acknowledgment that complete billboard bans may be the only reasonable means by which a legislature can advance its interests in traffic safety and aesthetics.

**III. CONCLUSION**

For the reasons set forth above, we will affirm the District Court's grant of summary judgment in favor of Mount Laurel.